IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| BIS COMPUTER SOLUTIONS, INC., <br><br> Plaintiff, <br><br> v. <br><br> HALIFAX CORPORATION, <br><br> Defendant. | Civil Action Number 3:05CV470-JRS |

## MEMORANDUM OPINION

THIS MATTER comes before the Court on Defendant Halifax Corporation's ("Halifax") Motion for Summary Judgment. For the reasons discussed herein, Halifax's Motion for Summary Judgment is GRANTED.

## I.   BACKGROUND

The allegations in Count One of BIS Computer Solutions, Inc.'s ("BIS") Complaint[1] are based on an agreement between the City of Richmond (the "City") and Halifax, pursuant to which Halifax agreed to develop and provide the City's Police Department with a new Records Management System ("RMS"). On March 22, 2000, the City and Halifax executed Contract No. 99233-1 (the "Prime Contract"), outlining the terms of their agreement. The Prime Contract contained provisions acknowledging that Halifax would be sub-contracting some of its work to BIS, a company with technical expertise in software and computer systems.

---

[1] Count One is BIS's only remaining cause of action.

Also on March 22, 2000, Halifax and BIS executed Subcontract No. 99233-1-SA1 (the "Subcontract"). Under the Subcontract, BIS agreed to develop special "Application Software" that would, in turn, be licensed to the City. BIS also agreed to deliver to the City and install all object codes for the Application Software consistent with Schedule C of the Subcontract.

As explained in both the Prime Contract and the Subcontract, BIS was to carry out its obligations in two phases. "Acceptance testing," conducted in "Phase One," would allow the City to determine, "in its sole discretion," whether to accept the Application Software. See City of Richmond Service Contract, art. 7.2; Standard Subcontract Agreement, art. 13.2. Under the Prime Contract, the City had fourteen days to conduct the testing and was obligated to notify Halifax of "its [a]cceptance [t]esting findings in writing" by the close of business on the fifteenth day. City of Richmond Service Contract, art. 2.8. "Phase Two" would only begin after the successful completion of Phase One. Of particular importance, there was a direct interplay between the Prime Contract entered into by the City and Halifax, and the Subcontract entered into by Halifax and BIS. The relevant sections of the Prime Contract and Subcontract provide:

> **Termination Due to Failure in Phase One**: *Notwithstanding any other provision of this Contract* or any addendum or attachment thereto, City may, *at its sole discretion*, terminate this Contract and make no payments to Halifax beyond expenses incurred in accordance with City's travel policy during the thirty (30) calendar day on-site visit to Richmond, Virginia, if (1) Halifax or any subcontractor thereof does not deliver the Application Software, (2) *City does not accept the Application Software*, or (3) acceptance testing detects Level 1 or Level 2 Bugs in the Application Software.

City of Richmond Service Contract, art. 7.2 (emphasis added); and, similarly,

> **Termination Due to Failure in Phase One**. *Notwithstanding any other provision of the Prime Contract* or any addendum or attachment thereto, City may, *at its sole discretion*, terminate the Prime Contract and make no payments to [Halifax] beyond expenses incurred in accordance with City's travel policy

during the thirty (30) calendar day on-site visit to Richmond, Virginia, if (1) [Halifax] or any subcontractor thereof does not deliver the Application Software, (2) *City does not accept the Application Software*, or (3) acceptance testing detects Level 1 or Level 2 Bugs in the Application Software. *In the event City terminates the Prime Contract under provision 7.2 of the Prime Contract, [Halifax] will immediately terminate this [Subcontract].*

Standard Subcontract Agreement, art. 13.2 (emphasis added).

BIS delivered the Application Software to the City on August 22, 2000, and, the next day, the City began Phase One testing. Soon thereafter, the City noted several problems with the Application Software. On August 24, 2000, the City and Halifax agreed, with BIS's consent, to temporarily cease Phase One testing so that BIS could attempt to revise the Application Software. BIS revised the Application Software over the next few weeks, and, on November 5, 2000, BIS provided the revised Application Software to the City. The City began Phase One testing of the revised version of the Application Software on November 6, 2000.

The City stopped Phase One testing again on November 17, 2000, after continuing to detect problems with the Application Software. At least some of these problems were recorded and identified as "Level 1 or Level 2 Bugs," as defined in both the Prime Contract and the Subcontract. See City of Richmond Service Contract, arts. 1.12–.13; Standard Subcontract Agreement, arts. 2.12–.13. Throughout the application testing process, the City provided Halifax and BIS with feedback reports detailing the problems that were being encountered. The Management Committee for the Prime Contract immediately held a meeting and described and demonstrated the Level 1 and Level 2 bugs detected during testing to several City officials. The City decided to terminate the Prime Contract with Halifax, pursuant to Article 7.2 of the Prime Contract.

In a letter that was hand-delivered to Halifax on November 17, 2000, the City stated that it had concluded its testing of the RMS Application Software and had regrettably decided to cancel the Prime Contract in accordance with the terms and conditions described therein.  In an e-mail sent on November 27, 2000, a City official forwarded to Halifax several documents explaining the reasons for the City's decision not to accept the Application Software and reconveying the City's intent to terminate the Prime Contract.

Halifax attempted on numerous occasions to persuade the City to change its position and allow for the project to continue.  Despite Halifax's efforts, the City refused to change its position and stood by its initial decision to terminate the Prime Contract.  Pursuant to the procedure outlined in Article 13.2 of the Subcontract, Halifax sent a letter to BIS on May 4, 2001, terminating the Subcontract.

BIS filed its Complaint on July 1, 2005, alleging, in relevant part, that Halifax had wrongfully terminated and breached the Subcontract.  Halifax filed its Motion for Summary Judgment on December 21, 2005.

## II.   SUMMARY JUDGMENT STANDARD

A motion for summary judgment can be granted only when "there is no genuine issue as to any material fact" and where the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  A court must view the facts and the inferences drawn therefrom in the light most favorable to the non-moving party. Ballinger v. North Carolina Agric. Extension Serv., 815 F.2d 1001, 1004 (4th Cir. 1987).  Although the facts are construed in this manner, a court must inquire into "the genuineness and materiality of any purported factual issues."  Ross v. Commc'ns Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985)

(emphasis in original).  Material facts are those which "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The determination of the genuineness of an issue "calls for an examination of the entire record then before the court in the form of pleadings, depositions, answers to interrogatories, admissions on file and affidavits." Ross, 759 F.2d at 364.  An issue is genuine "when the evidence . . . create[s] fair doubt; wholly speculative assertions will not suffice."  Id.  A motion for summary judgment cannot be granted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

## III.   DISCUSSION

### A.   The Parties' Arguments

Halifax relies heavily on the express language of the Prime Contract and the Subcontract in support of its contention that it did not breach its contractual obligations.  In particular, Halifax highlights the two-phase nature of the parties' contractual relationship, as well as the discretion the City had in deciding whether to accept the Application Software.  Halifax also alleges that BIS should be barred from recovery for failing to follow the dispute resolution procedures outlined in the Subcontract, and also because BIS has already received all payments to which it is entitled under Article 15.1 of the Subcontract.

In opposition, BIS argues that the language in the Prime Contract and the Subcontract is ambiguous in explaining when the City could properly terminate the Prime Contract, which would, in turn, trigger Halifax's right to terminate the Subcontract.  BIS also states that there is a genuine issue of material fact regarding the existence of Level 1 or Level 2 Bugs in the Application Software as delivered to the City.  As BIS further contends, the City accepted the Application Software by

default by failing to report to Halifax its findings within fifteen days of beginning acceptance testing, as required by Article 2.8 of the Prime Contract.  Finally, BIS asserts that it did follow the proper procedure for reporting a dispute, and that it should be entitled to additional compensation due to BIS's termination of the Subcontract without cause.

## B.    The Court's Findings

As a preliminary matter, BIS has not demonstrated the existence of a genuine issue of material fact.  BIS's Brief in Opposition does not comply with the requirements of Federal Rule of Civil Procedure 56(e) and Local Civil Rule 56(B).  Federal Rule of Civil Procedure 56(e) explains that an adverse party's response to a motion for summary judgment cannot "rest upon the mere allegations or denials of the adverse party's pleading," but must actually, "by affidavits or as otherwise provided in . . . [Rule 56], . . . set forth the specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  The rule further provides that, "[i]f the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party."  Local Civil Rule 56(B) provides, more specifically, that a brief in response to a motion for summary judgment must have a section "listing all material facts as to which it is contended that there exists a genuine issue necessary to be litigated and citing the parts of the record relied on to support the facts alleged to be in dispute."  E.D. Va. Loc. Civ. R. 56(B).  A statement that is not properly controverted in the adverse party's statement of genuine issues of material fact may be assumed to be admitted.

BIS's separately captioned "Disputed Facts" section of its Brief in Opposition does not contain any citations to the parts of the record relied on to support the facts alleged to be in dispute. Accordingly, and having determined that Halifax's "Statement of Undisputed Facts" is adequately

supported by citations to the record, the Court accepts the facts offered by Halifax as undisputed and, consequently, admitted by BIS.

Finding that no genuine issue of material fact exists, the Court must address a relatively straightforward issue of contract interpretation.  The Supreme Court of Virginia has articulated the fundamental principle that courts "must give effect to the intention of the parties *as expressed in the language of their contract*, and the rights of the parties must be determined accordingly."  Foti v. Cook, 220 Va. 800, 805, 263 S.E.2d 430, 433 (Va. 1980) (emphasis added).  In interpreting a contract with "clear and unambiguous [terms], a court must construe [the terms] according to their plain meaning."  Bridgestone/Firestone, Inc. v. Prince William Square Assocs., 250 Va. 402, 407, 563 S.E.2d 661, 664 (Va. 1995).  A court "[can]not insert by construction, for the benefit of a party, an exception or condition which the parties omitted from their contract by design or neglect."  Id. Ultimately, "[t]he parties' contract becomes the law of the case unless it is repugnant to some rule of law or public policy."  Winn v. Aleda Constr. Co., 227 Va. 304, 307, 315 S.E.2d 193, 194 (Va. 1984).

The relevant language of the Prime Contract and the Subcontract is clear and unambiguous.  Article 7.2 of the Prime Contract enumerates three independent grounds the City could cite, in its sole discretion, to terminate the Prime Contract with Halifax:

> Notwithstanding any other provision of the Prime Contract or any addendum or attachment thereto, City may, ***at its sole discretion***, terminate the Prime Contract . . . if (1) [Halifax] or any subcontractor thereof does not deliver the Application Software, (2) ***City does not accept the Application Software***, or (3) acceptance testing detects Level 1 or Level 2 Bugs in the Application Software.

City of Richmond Service Contract, art. 7.2 (emphasis added).  Article 13.2 of the Subcontract explains when Halifax would be justified in terminating the Subcontract with BIS:

> *In the event City terminates the Prime Contract under provision 7.2 of the Prime Contract*, [Halifax] will immediately terminate this [Subcontract].

Standard Subcontract Agreement, art. 13.2 (emphasis added).

The facts on the record illustrate that Halifax, in terminating the Subcontract with BIS, acted wholly within the bounds of its contractual rights and duties.  The Prime Contract afforded the City the right to conduct fourteen days of acceptance testing to determine whether to accept BIS's Application Software.  The City began Phase One's acceptance testing process on August 23, 2000.  Noting problems and/or potential Level 1 or Level 2 bugs in the Application Software, the City suspended testing on August 24, 2000.  The City reinitiated the acceptance testing process on November 6, 2000.  Eleven days later, on November 17, 2000, the City stopped the testing.  Having detected what it suspected to be Level 1 or Level 2 bugs, the City decided not to accept the Application Software and to terminate the Prime Contract with Halifax.  Also on November 17, 2000, the City hand-delivered a letter to Halifax indicating that it had concluded the acceptance testing process and had decided to terminate the Prime Contract.  The plain language of the Prime Contract granted the City the right to terminate under Article 7.2(2) of the Prime Contract, because the City "[did] not accept the Application Software."  City of Richmond Service Contract, art. 7.2(2).  The City's notice to Halifax of its decision was timely, because it was communicated within the fifteen-day period specified in Article 2.8 of the Prime Contract.[2]

---

[2] BIS suggests that the letter did not constitute proper notice, because it did not reveal the specific details of the acceptance testing findings.  The Prime Contract did not, however, require the notice to contain a minimum level of details.  Moreover, the City had already notified Halifax and BIS during the acceptance testing process of its ongoing findings.  The Court is, therefore, satisfied that the November 17, 2000, letter was sufficient.

8

On May 4, 2001, after trying unsuccessfully to dissuade the City from terminating the Prime Contract, Halifax terminated the Subcontract with BIS, pursuant to Article 13.2 of the Subcontract.  It is this act, BIS argues, that constituted a breach of the Subcontract.  The Court, after an honest reading of the express language of both the Prime Contract and the Subcontract, cannot agree.  Mindful of its obligation to "construe the words as written and not make a new contract for the parties," the Court will grant Halifax's Motion for Summary Judgment.  See Bridgestone/Firestone, Inc. v. Prince William Square Assocs., 250 Va. 402, 407, 563 S.E.2d 661, 664 (Va. 1995).

## IV.   CONCLUSION

For the reasons stated, Halifax's Motion for Summary Judgment is hereby GRANTED.

An appropriate Order shall issue.

ENTERED this   27th   day of January, 2006

                                    /s/
                    _____
                           James R. Spencer
                           CHIEF UNITED STATES DISTRICT JUDGE